Robert Muller, SBN 189651
bob@cypressllp.com
Stephen J. Kelly, SBN 275784
stephen@cypressllp.com
CYPRESS LLP
11111 Santa Monica Boulevard, Suite 500
Los Angeles, California 90025
Telephone:  424-901-0123
Facsimile:  424-750-5100

Attorneys for Plaintiff Royal Holdings
Technologies Corporation, d/b/a X.Labs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROYAL HOLDINGS TECHNOLOGIES CORPORATION, D/B/A X.LABS, a Delaware corporation,<br><br>               Plaintiff,<br><br>       v.<br><br>FLIR SYSTEMS, INC., a Delaware corporation<br><br>               Defendants. | CASE NO.: 2:20-CV-09015-VAP-GJS<br><br>FIRST AMENDED COMPLAINT FOR:<br><br>1.  BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;<br>2.  FRAUDULENT INDUCEMENT;<br>3.  INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS AND/OR PROSPECTIVE ECONOMIC ADVANTAGE;<br>4.  UNFAIR PRACTICES IN VIOLATION OF BUSINESS AND PROFESSIONS CODE §§ 17200, et seq.;<br>5.  UNFAIR COMPETITION THROUGH FALSE ADVERTISING IN BUSINESS VIOLATION OF SECTION 43(a)(1) OF THE LANHAM ACT (15 U.S.C. § 1125(a)(1)); and<br>6.  FALSE ADVERTISING IN VIOLATION OF BUSINESS AND PROFESSIONS CODE §§ 17500, et seq.<br><br>**JURY TRIAL DEMANDED** |

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

Plaintiff, Royal Holdings Technologies Corporation, d/b/a X.Labs ("X.Labs"), hereby alleges as follows:

## L.R. 8-1 JURISDICTIONAL STATEMENT

This Court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1338(a), as this case involves federal questions arising under the Trademark Act of 1946, as amended, 15 U.S.C. § 1051 *et seq.* This Court has supplemental jurisdiction pursuant to 28 U.S.C. §§ 1338(b) and 1367(a) over the asserted state law claims.

## SUMMARY OF THE CASE

1. X.Labs is the creator of a revolutionary, cost-competitive, non-contact human elevated skin temperature screening system. FLIR Systems, Inc. ("FLIR") was X.Labs' supplier for one of the system's components, a low-cost thermal imaging camera adapted for use with a smartphone. In early 2020, FLIR, sensing a business opportunity for itself, unfairly took advantage of the good will and trust that X.Labs had placed in the parties' long-standing business relationship. FLIR reneged on its promise to deliver a large number of the cameras. It trumped up a thinly veiled excuse for trying to cancel the order and the parties' contract. It sought to sabotage X.Labs' ability to deliver its system to the market during the onset of the COVID-19 pandemic by publicly announcing that it was cancelling its business relationship with X.Labs and wrongly implying that X.Labs' system's use of FLIR's cameras was inaccurate for elevated skin temperature screening. Confronted with third-party verification that FLIR's statements about the use of its camera in X.Labs' system were wrong, FLIR refused to budge, electing instead to launch its plan to attempt to insert itself as the market leader, all to X.Labs' detriment.

2. In early 2020, X.Labs developed an innovative elevated skin temperature detection and screening system called the "FEEVR" system. The FEEVR system utilizes a thermal imaging camera and a proprietary advanced artificial intelligence ("AI")-based algorithm to preliminarily detect and screen persons with elevated skin

C Y P R E S S   L L P
1111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

temperatures. To deliver this product, X.Labs relied on its long-term camera supplier, FLIR, to provide a thermal imaging camera named the "FLIR ONE Pro."

3.      To help deliver its system to customers, X.Labs placed an order with FLIR for over 5,000 FLIR ONE Pro cameras at a price of over $1,500,000 under a product supply agreement between the parties in 2018 ("2018 PSA"). FLIR immediately acknowledged this order and agreed to supply the FLIR ONE Pro cameras. X.Labs relied on this agreement to enter into sales agreements and accept purchase orders for the FEEVR system from thousands of customers. This allowed X.Labs the runway to deliver on the growing market demand for the FEEVR system.

4.      However, instead of performing its obligations under the 2018 PSA, FLIR sabotaged X.Labs' ability to compete in this market when FLIR saw an opportunity to advance its own ambitions to profit from this rapidly developing market segment. In short, while telling X.Labs that it would continue to be its supplier, FLIR began to engage in a secret scheme to suppress sales in the low-priced elevated skin temperature screening market and thereby preserve FLIR's sales of its more expensive thermal cameras. More shockingly, FLIR used its position as the supplier of a component of X.Labs' FEEVR system to impede X.Labs' position in the market. Shortly after agreeing to fulfill X.Labs' order in March 2020, FLIR began to make false statements to IP Video Marketing Info, Inc. ("IPVM"), a group of self-professed specialists in video surveillance technology. These statements were published in a series of articles to IPVM's members and subscribers. For instance, on March 20, 2020, FLIR falsely told IPVM: "[FLIR] do[es] not have a product supply agreement" with X.Labs, creating the false impression to X.Labs' customers and potential customers that it did not have the ability to provide the FEEVR system.

5.      On information and belief, FLIR is a subscriber to IPVM and has coordinated with IPVM relating to the publication of knowingly false statements and articles critical of X.Labs and the FEEVR system.

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

6.      Meanwhile, on April 15, 2020, FLIR's National Sales Manager then requested X.Labs sign a "new" PSA for future purchasing requests. FLIR failed to mention that the "new" PSA included several material, substantive changes to the parties' long-term purchasing relationship. In May 2020, when later asked by IPVM again about its relationship with X.Labs, FLIR again knowingly and falsely said that it "had one previous contract with Royal Holdings/Feevr that we cancelled and I can confirm we are in the process of cancelling a second contract with them now."

7.      Compounding the problem, FLIR then made statements it knew or should have known to be false regarding the FEEVR system's use of the FLIR ONE Pro cameras. On April 14, 2020, FLIR made a public statement that "we [FLIR] do not recommend the FLIR ONE Pro … for this use case." In essence, FLIR facilitated IPVM's defamatory statements regarding X.Labs' business and products through FLIR's statements about the FLIR ONE Pro -- which resulted in the continuation of false and defamatory statements about the FEEVR system to IPVM's members and subscribers.

8.      On May 18, 2020, FLIR created a false narrative about why it needed to "cancel" its contract with X.Labs and then purported to exercise an (illusory) termination clause in the parties' new PSA. As a result, X.Labs was left without its primary supplier for a component of its FEEVR system. FLIR's true intent all along appears to have been for an improper motive.

9.      Since FLIR's purported "cancellation" of the PSA, X.Labs discovered that FLIR, attempting to salvage its dwindling revenues, was all along looking for a reason to suppress X.Labs' sales in the low-priced elevated skin temperature screening market and thereby preserve FLIR's sales of its more expensive thermal cameras. Among other things, from January to July 2020, FLIR registered the trademark "EST," referencing elevated skin temperature. FLIR also ended its software licenses with its developers, apparently with the goal of suppressing sales of low-priced elevated skin

C Y P R E S S   L L P
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

temperature detection and screening product that might otherwise compete with FLIR's sales of its more expensive thermal cameras.

10.     X.Labs' repeated attempts to get FLIR to correct the above wrongs have been to no avail, thus necessitating this lawsuit. It should be clear that X.Labs is not requesting, demanding or otherwise attempting to require FLIR to supply it with FLIR ONE Pro cameras. Rather, FLIR's independent tortious conduct requires X. Labs to respond.

### THE PARTIES

11.     Royal Holdings Technologies Corporation, d/b/a X.Labs, is a Delaware corporation with its principal place of business located in Los Angeles, California.

12.     FLIR Systems, Inc. is a Delaware corporation with its principal place of business located in Wilsonville, Oregon.

### JURISDICTION AND VENUE

13.     This Court has personal jurisdiction over all parties as either all of the parties regularly conduct business within this State or the acts and/or omissions complained of arose out of the parties' conduct within this State.

14.     Venue is proper pursuant to 28 U.S.C. §§ 1391(a), (b) and (c) in that a substantial part of the acts and/or omissions giving rise to this action occurred in this District.

### GENERAL ALLEGATIONS

**The FEEVR System**

15.     X.Labs is an award-winning technology company specializing in products and services in the public safety detection and digital health-related sectors. X.Labs has multiple times been recognized at the "ASTORS" Homeland Security Award Program for providing cutting-edge technology used in public safety products. Its customers have included numerous governmental entities and publicly traded companies.

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

16.     In 2017, X.Labs began development of the "SWORD" system, an innovative smartphone-based security scanning and weapons detection system utilizing X.Labs' proprietary advanced AI algorithm. The SWORD system can detect metallic and non-metallic weapons at a distance of twenty feet utilizing patented millimeter wave detection, facial recognition technology, and a thermal camera component.

17.     As part of the SWORD system, X.Labs sourced a thermal camera named the "FLIR ONE Pro" from FLIR. This camera formed a component of the SWORD system for detecting surface temperature readings within the camera's visual field. These temperature readings are then analyzed with other data points to provide notifications to a user that a weapon may be in view of the camera.

18.     In October 2018, X.Labs and FLIR entered into the 2018 PSA. The 2018 PSA purported to ensure that X.Labs would have access to sufficient quantities of the FLIR ONE Pro cameras it needed to meet its projected growth in the sales of its innovative technology.

19.     Starting in 2018, the development of the SWORD technology led to rapid growth for the company. Initial production prototypes were showcased at the January 2020 Consumer Electronics Show ("CES") in Las Vegas, which lead to substantial purchase orders for the SWORD system.

20.     Shortly after the January 2020 CES, the world was upended by the SARS-CoV-2, "Coronavirus" pandemic. X.Labs immediately realized this pandemic would create a significant need for non-contact screening systems because elevated skin temperature and fever are associated with COVID-19-infected individuals. X.Labs quickly utilized its knowledge base from the SWORD system to develop a new product named the FEEVR system. The FEEVR system utilizes the FLIR ONE Pro camera along with X.Labs' proprietary AI-based algorithm to preliminarily screen and detect individuals with elevated skin temperatures from a distance. Upon identification of such individuals, the program alerts the user of the FEEVR system to

C Y P R E S S   L L P
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

identify and isolate such individuals for a secondary screening and medical examination.

21.     Notably, the FEEVR system does not use the FLIR Software Development Kit ("SDK") nor any software developed by FLIR. Rather, the FEEVR system utilizes software completely developed and deployed by X.Labs. Furthermore, X.Labs expressly disclaims that the FEEVR system is an FDA-approved medical device or that it is intended for any medical uses. The FEEVR system simply allows preliminary screening and identification of persons with elevated skin temperatures for secondary medical evaluation.

22.     Importantly, even small businesses can adopt the FEEVR system quickly and economically. The FEEVR system targeted a unique segment of the temperature detection and screening platform market because of its relatively low cost (~$2,500), yet accurate, all-in-one system that could be utilized at the consumer level. Most comparable systems retail for over $10,000 per system.

23.     Predicting the exponential market demand and need for its FEEVR system, on March 13, 2020, X.Labs placed a $1,500,000 order with FLIR for over 5,000 FLIR ONE Pro cameras. FLIR quickly acknowledged and accepted X.Labs' order and began to work with X.Labs on a delivery schedule.

24.     On March 25, 2020, with its supply chain secured — or so X.Labs believed — X.Labs announced the launch of the FEEVR system. X.Labs immediately received enthusiastic sales interest for its FEEVR system and began to prepare for the rapid production and delivery of its new system.

**The FLIR ONE Pro Camera**

25.     The FLIR ONE Pro camera is a low-cost, professional-grade thermal camera adapted for use with a smartphone system.

26.     Unlike a normal camera which captures visual light reflected to the optical lenses, the FLIR ONE Pro is a thermal imaging camera, which captures infrared light. Infrared light is not visible to the human eye and radiates off any object

C Y P R E S S   L L P
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

where heat is being transferred. In general terms, the hotter an object is, the more infrared radiation it produces. The thermal imaging camera captures this infrared light through an image sensor. The infrared energy is then focused onto a special sensory array that contains thousands of detector pixels arranged in a grid. Each pixel in the sensory array reacts to the infrared energy focused on it and produces an electronic signal. A processor then takes these electronic signals from each pixel and creates a color map that visually represents the apparent temperature of the object. This color map can then be viewed through a display to see the relative heat signatures presented by objects in the thermal imaging camera's field of view.

27.    Because of their particular capabilities, thermal imaging cameras have typically been much more expensive than comparable visual cameras. The FLIR ONE Pro, however, is sold at a comparatively low price point of approximately $300 and is adaptable for use with a smartphone. As a result, while most thermal imaging systems would dramatically increase the cost of the FEEVR system, the FLIR ONE Pro camera is a low-priced component product that would allow X.Labs to maintain its low price point for the FEEVR system. Thus, the parties' long-standing relationship and the FLIR ONE Pro made FLIR an ideal supply source for the FEEVR system.

28.    In its advertising materials, FLIR represents that the accuracy of the FLIR ONE Pro camera, standing alone, is ± 3° Celsius. In other words, FLIR represents that temperature measurements by the FLIR ONE Pro camera can vary from 3° Celsius over to 3° Celsius under the actual temperature of the object whose temperature is being measured. This accuracy specification is calculated using the Root-Sum-of-Squares or "RSS" analysis technique. The RSS technique involves taking all the partial error variables present within the infrared image (i.e., the things that can cause alterations to the temperature readings, such as ambient temperatures, atmospheric temperatures, transmittance, emissivity, and calibrator temperature), square each error term, sum them, and then take the square root of that number to

Cypress LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

find the value that is most appropriate to specify how "inaccurate" the camera can be when taking temperature readings. This means that FLIR's purported accuracy rating of ± 3° Celsius is found using the average of all temperatures within the range of the FLIR ONE Pro camera (from -20° Celsius to 400° Celsius) under all conditions and all known variables. This is commonly referred to as the "overall error specification" for a camera's accuracy.

29. However, FLIR knew or should have known that certain systems using the FLIR ONE Pro, such as the FEEVR system, can provide accuracies of much less than ± 3° Celsius. By controlling for and reducing certain variables within the image, the error specification of a system using the FLIR ONE Pro can be within a much smaller range than by the FLIR ONE Pro, standing alone, using the flat RSS analysis in finding a temperature. To enhance accuracy, the FEEVR system uses AI-based logical reasoning to identify the specific region of an individual's forehead that has a direct correlation to the temporal artery; detect the skin temperature of that region; and disregard other temperatures in the field of view. Thus, the FEEVR system uses AI-based logical reasoning to tailor the area of focus for temperature measurement to a specific and discrete region of the forehead. Therefore, to claim that all systems using the FLIR ONE Pro under all use cases can only provide accuracy within ± 3° Celsius under all circumstances is flatly inaccurate. The above principles were known by X.Labs and either were known or should have been known by the developer of the camera itself, FLIR.

30. Indeed, actual independent testing of the FEEVR system using the FLIR ONE Pro by an engineer skilled in the relevant field showed that the average skin temperature measurements recorded by the FEEVR system across all subjects and trials were all within ± 1° Celsius of temperature measurements recorded by an FDA-approved device (Extech IR200 Non-Contact Forehead Infrared Thermometer) and a thermal camera with the thermal resolution that FLIR states is sufficient for conducting elevated skin temperature screening (the Fluke Ti32 Infrared Camera).

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

9

Therefore, to say that all systems using the FLIR ONE Pro camera, such as the FEEVR system, are only accurate to within ± 3° Celsius and cannot be used for non-contact elevated skin temperature readings is demonstrably false.

**FLIR's Involvement with IPVM**

31.     X.Labs is informed and believes that after acknowledging and accepting X.Labs' March 2020 order, FLIR began to recognize the market opportunity for elevated skin temperature detection and screening systems like the FEEVR system. X.Labs is further informed and believes that FLIR planned to preserve the market for sales of its more expensive thermal cameras and tortiously engaged in anti-competitive behavior by seeking to remove X.Labs as a would-be, low-priced competitor from the market or, at least substantially impede X.Labs' ability to compete against FLIR. On information and belief, FLIR sought to accomplish this task through coordinating with IPVM to make false, misleading, and defamatory statements concerning the FEEVR system and X.Labs' reputation.

32.     IPVM is a self-professed video surveillance technology specialist magazine and touts itself as "the world's leading authority on video surveillance." However, IPVM does not have any specialized knowledge, training, or experience with any thermal imaging system or any system used in the assessment of human temperature. With the exception of the FEEVR system, IPVM has never tested or analyzed any thermal imaging system or any system for assessing skin or body temperature.

33.     On information and belief, while claiming on its website to be an "independent" authority, IPVM, in coordination with FLIR, began to publish a series of articles about the FEEVR system. In a March 31, 2020 article, IPVM made a series of false criticisms regarding the FEEVR system, including false statements about the FEEVR system's accuracy and X.Labs' marketing claims. When FLIR apparently was asked to comment on the article, a FLIR representative said: "[W]e do not have a PSA with Feevr or X.Lab[s] or an agreement for them to use our copyrighted

C Y P R E S S   L L P
1111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

material." This statement was false — FLIR and X.Labs at that time had an active PSA that had been in effect since October 12, 2018, and just two weeks prior FLIR had agreed to deliver X.Labs' order for over 5,000 FLIR ONE Pro cameras. It is unclear why FLIR would make any statements to anyone, including a so-called video surveillance technology specialist, about its business relationship with X.Labs. It is shocking that FLIR would make such a false statement, which appears to have been made to sow doubt about X.Labs' business and the accuracy, proprietary nature, and effectiveness of its FEEVR system.

34.     The March 31, 2020 IPVM article contained various other materially false and misleading statements by FLIR that FLIR knew or should have known were false and misleading. For example, when IPVM claimed that "the FLIR ONE Pro specifies accuracy of only $\pm 3°C$ (~5.4°F), a huge range for measuring body temperature," FLIR misleadingly stated in response to IPVM's request for comment that "we have a different set of cameras that we market for elevated skin temperature screening. The FLIR ONE Pro is not on that list." However, as demonstrated above, the FEEVR system, which utilizes X.Labs' proprietary AI-based software that controls for known variables within the environment, among other things, significantly raises accuracy over the represented $\pm 3$ degrees Celsius accuracy for the standalone FLIR ONE Pro camera. FLIR knew or should have known that certain systems using the FLIR ONE Pro, such as the FEEVR system, can be utilized for preliminary elevated skin temperature detection and screening. Therefore, FLIR knew or should have known that blanket statements that any system utilizing the FLIR ONE Pro camera can only ever be accurate to within $\pm 3$ degrees Celsius are demonstrably false.

35.     Thereafter, on April 14, 2020, IPVM published another article entitled "Beware of Feevr." On information and belief, FLIR coordinated with IPVM to have the April 14, 2020 article to be published. This article contained even more false and/or misleading statements regarding the FEEVR system. Most relevant here, the

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

article asserts that the FEEVR system "fundamentally lacks accuracy for its use, *as its thermal provider FLIR has said* and IPVM testing has shown" (emphasis added). The article, after positing that the FEEVR system was too inaccurate to be used for elevated skin temperature screening, quotes a "[FLIR] spokesperson" who said, regarding the FEEVR system, "We [FLIR] do not recommend the FLIR ONE Pro or Lepton-based devices for this use case."

36.     These statements are false, misleading and imply false conclusions of fact. First, on information and belief, FLIR had never obtained nor tested the actual FEEVR system. Therefore, any express or implied claim by FLIR regarding the accuracy of the FEEVR system is reckless, malicious, violates basic principles of good engineering, and willfully fraudulent and lacks any basis in fact. Second, FLIR knew or should have known that certain systems using the FLIR ONE Pro, such as the FEEVR system, can be utilized for elevated skin temperature detection and screening, provided that, for example, the known variables are controlled for and the system calculates within a known limited temperature range under known ambient conditions. By claiming otherwise, FLIR is intentionally misleading the IPVM's members and subscribers on the accuracy and capabilities of at least the FEEVR system's use of the FLIR ONE Pro camera and has thus damaged X.Labs' reputation and ongoing business.

37.     On information and belief, on May 7, 2020, IPVM in coordination with FLIR, published another article repeating falsities regarding alleged "potential issues with the FEEVR system's usage of the FLIR ONE Pro, both on accuracy and using the FLIR SDK" and "the FLIR ONE Pro they [X.Labs] use [being] 10x less accurate than" an FDA approved thermal gun.  These statements are false. As alleged above, independent third-party testing has confirmed that the FEEVR system is in fact accurate and reliable for its intended purpose of screening and detecting individuals that may have elevated skin temperatures.

38.     On May 20, 2020, IPVM published an article which contained a May 18, 2020 statement from FLIR: "We [FLIR] had one previous contract with [X.Labs] that we cancelled and I can confirm we are in the process of cancelling a second contract with them now." On information and belief, the May 20, 2020 article was also published in coordination with FLIR. . As discussed below, this statement is materially false and misleading as it was FLIR which, on April 15, 2020, suggested replacing the parties' original 2018 PSA with a new PSA. FLIR knew or should have known that the nature of this statement would cause serious concern with X.Labs' customers, potential customers, and suppliers, raising the idea that X.Labs would have camera sourcing issues and X.Labs would not be able to deliver its FEEVR systems.

**The 2020 PSA**

39.     On April 15, 2020, Todd Faulkner, the National Sales Manager, Field Sales for FLIR, e-mailed Barry Oberholzer, X.Labs' CEO, to inform Mr. Oberholzer that FLIR had cancelled the 2018 PSA and needed X.Labs to enter into a new PSA, stating that "[t]he agreement that we connected to was originally with our OEM group and it was canceled. I have the contracts people sending out a new one that is with this group. It is the same schedule. Please sign and send back right away as everything is stalled." This new PSA was prepared solely by FLIR ("2020 PSA").

40.     On April 15, 2020, Mr. Faulkner of FLIR forwarded the 2020 PSA to X.Labs. However, contrary to the representations in Mr. Faulkner's April 15, 2020 e-mail, the 2020 PSA did not have the "same schedule." Notably, neither Mr. Faulkner nor any other FLIR representative mentioned that it was adding materially different terms into the 2020 PSA. For example, it included a broad, ambiguous purchasing condition that prohibited any so-called "Medical Use" of the FLIR ONE Pro cameras by X.Labs. The 2020 PSA further provided that this purchasing condition would apply retroactively to X.Labs' March 13, 2020 purchase order for the FLIR ONE Pro cameras.  Faced with FLIR's substantially superior bargaining power as the source of

Cypress LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

the FLIR ONE Pro camera component of X.Labs' FEEVR system, X.Labs' need to fulfill its outstanding purchase orders for the FEEVR system, and in reliance on Mr. Faulkner's explanation for the necessity to replace the 2018 PSA with a new one, on April 15, 2020, X.Labs executed the 2020 PSA.

41.     Shortly thereafter, on May 7, 2020, Mr. Faulkner sent Mr. Oberholzer another e-mail in which he represented that FLIR "should receive their shipment of cameras by Tuesday of next week" and reassured Mr. Oberholzer that "as soon as they come in we will turn them around and ship right out [to X.Labs]." Additionally, for the first time, Mr. Faulkner said "that I am getting pressure from legal that they want you to acknowledge specifically FLIR's messaging below. [. . .] we cannot support any developers that want to use FLIR ONE PRO to screen for fever or sickness."

42.     Mr. Oberholzer responded by e-mail the same day confirming that X.Labs does not promote the FLIR ONE Pro camera for elevated skin temperature scanning. Mr. Oberholzer also noted the disclaimer on X.Labs' website:

> FEEVR is not a medical device and is not intended for any diagnosis or clinical measurements. FEEVR is only to be used to perform a preliminary scan and is intended for screening individuals or monitoring an individual for potential elevated skin temperatures. It is not a substitute for a clinical thermometer. Always use a clinical thermometer as a **secondary screening protocol** when high accuracy body temperature measurements are required." Mr. Oberholzer finishes his e-mail by stating that "[a]s part of our EST package we also sell FEEVR Verify which is an FDA Approved disposable thermometer which our clients use as a secondary testing method.

(Emphasis in original.)

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

43.     Mr. Faulkner responded on May 8, 2020, confirming that the FLIR ONE Pro cameras had already been shipped to X.Labs, but that they had to clear customs. Mr. Faulkner promised to confirm on the following Monday, May 11, 2020, when the cameras "will go out." Mr. Faulkner further stated that they "are still dealing with materials but are still optimistic on catching back up." On May 14, 2020, Mr. Faulkner sent an e-mail to Mr. Oberholzer stating: "Hey Barry, Great news, just found out we are getting 400 units for you. You currently have credit for 200. Do you want to wire for the other 200 and we should be able to get them all out to you?"

44.     On May 15, 2020, Russell Sherman of FLIR sent an e-mail confirming receipt of a wire transfer from X.Labs for $63,998 for the second 200 units of FLIR ONE Pro cameras.

45.     On May 15, 2020, Ms. Winnett, FLIR's Sales Operations Supervisor, Global Sales Operations, sent an e-mail confirming that "[w]e will have 200 units shipped today – the remaining 200 units will ship on Monday."

46.     The following Monday, May 18, 2020, Mr. Oberholzer sent e-mails to Ms. Winnett and Mr. Faulkner at 2:00 p.m. and 8:00 p.m., respectively, asking for the tracking numbers on the two orders for 200 units each that shipped.

**The Purported "Cancellation" of the 2020 PSA**

47.     On May 18, 2020, Mr. Oberholzer received a letter from FLIR's deputy general counsel, Chris Lewis, stating that FLIR was terminating the 2020 PSA. Mr. Lewis also claimed, falsely, that X.Labs had violated the FLIR ONE Pro camera software license. Mr. Lewis made the statement despite that FLIR knew that X.Labs uses its own proprietary AI-based mobile app software and does not utilize the FLIR SDK as part of its FEEVR system.

48.     The following day, May 19, 2020, at 9:37 a.m., Ms. Winnett responded to Mr. Oberholzer about the two orders for 200 units by stating that "[t]hese did not go out – I'm working to find out exactly why and we will get back to you asap."

49.     Three minutes later, at 9:40 a.m., Mr. Faulkner e-mailed Mr. Oberholzer to say "I just heard that nothing went out. We are trying to find out why that was and will get back to you."

50.     An hour and twenty-six minutes later, at 11:06 a.m., Mr. Faulkner sent an e-mail to Mr. Oberholzer telling him: "I am very sorry but I just received a copy of a letter of termination. This came from our legal department and as such they stopped all shipments. My understanding is that a refund is being processed. I am trying to find out more details and will get back to you."

51.     At 11:11 a.m., Mr. Oberholzer responded to Mr. Faulkner and Ms. Winnett as follows: "The letter of termination is effective May 28th, as you can see in the letter. We placed and paid the order last week while our agreement was active. Are you saying your legal department deliberately stopped our order when you already confirmed you will be shipping/that orders have shipped?  The agreement is still active and we expect the orders to be shipped."

52.     X.Labs did not receive any of the 400 units FLIR represented had been or would be shipped on May 15, 2020, and May 18, 2020. Indeed, to date, X.Labs has received none of the over 5,000 units it ordered from FLIR and which FLIR agreed to deliver in its March 17, 2020 Order Acknowledgment.

53.     Unsurprisingly, the next day, on May 20, 2020, IPVM published an article titled "FLIR Cancelling Contract with X. Labs / Feevr." Seemingly in coordination with this interest, FLIR issued a statement related to its relationship with X.Labs. It is unclear what interest or motivation IPVM, as a self-proclaimed authority in video technology, or FLIR, would have to publish articles concerning X.Labs' supplier contracts other than because FLIR coordinated with IPVM to do so in order to damage X.Labs' business and reputation.

**X.Labs' Attempts to Resolve the Dispute**

54.     On May 21, 2020, shortly after responding to the purported "notice of termination," X.Labs received a response from Mr. Lewis, regarding the purported

C Y P R E S S   L L P
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

termination of the PSA. In his letter, Mr. Lewis claimed that FLIR terminated the parties' original 2018 PSA based on FLIR's "internal position not to market, promote, or enable use of the FLIR ONE Pro for health- and medical-related uses including elevated body temperature screening" and further that "issues that have arisen as a result of routine customer due diligence conducted internally" by FLIR. Both of these statements have no basis in fact and were not mentioned at the time Mr. Faulkner stated that FLIR intended to "terminate" the original 2018 PSA and replace it with a new one. Additionally, Mr. Lewis claimed that the day after receiving the termination notice for the original PSA, that X.Labs had "reached out to the Instruments side" of the FLIR's business and initiated a new PSA. Mr. Lewis' statement is categorically false. As detailed above, Mr. Faulkner of FLIR recommended the parties execute the 2020 PSA.

55.     Finally, Mr. Lewis stated that FLIR was internally evaluating "whether there is a way that the FLIR ONE Pro can meet the accuracy, stability and reliability criteria that is necessary to ensure the cameras are deployed responsibly to fight the COVID pandemic." Mr. Lewis then described that FLIR was "open to considering proposals from well-established companies that demonstrates through test data" that the FEEVR solution will meet any potential limitations associated with the FLIR ONE Pro.

56.     On May 22, 2020, after receiving this correspondence from Mr. Lewis, Mr. Oberholzer responded by pointing out the numerous incorrect statements made by Mr. Lewis regarding the parties' relationship.

57.     In the meantime, actual testing of the FEEVR system using the FLIR ONE Pro camera by an engineer skilled in the relevant field corroborated that the FEEVR system is in fact accurate and reliable for its intended purpose of preliminarily screening and detecting individuals with elevated forehead skin temperature. These tests showed that the FEEVR system reaches similar accuracy

and reliability thresholds as at least one other camera cleared by the FDA in measuring elevated skin temperatures.

58.     On July 30, 2020, X.Labs informed FLIR that, in response to FLIR's concerns, it had conducted independent testing that verified the accuracy and reliability of the FEEVR system. X.Labs offered to share this underlying data with FLIR upon execution of a standard confidentiality agreement.

59.     On August 14, 2020, FLIR responded and repeated the claim that it is not currently "marketing, enabling, supporting, or promoting the use of the FLIR ONE Pro cameras for elevated skin temperature screenings," despite Mr. Lewis' earlier statements that FLIR *had been* internally evaluating such use. FLIR  further stated that it had never "*knowingly* made any false statements to IPVM regarding X.Labs (emphasis added)," and failed to acknowledge X.Labs' independent test results (despite that Mr. Lewis previously had said that FLIR would consider such testing).FLIR persisted in refusing to perform under the 2020 PSA and Purchase Order.

**FLIR Moves into the Same Market Occupied by the FEEVR System**

60.     These acts by FLIR, when taken in context of its subsequent conduct to develop its own $2,500 thermal detection system, reveal FLIR's true intent all along.

61.     Despite having acknowledged as recently as May 18, 2020, that it would fulfill X.Labs' Purchase Order, FLIR was at the same time applying to the US Patent and Trademark Office for the "EST" trademark in connection with the term, "Elevated Skin Temperature."

62.     In June 2020, FLIR issued a "developer update" regarding its FLIR ONE Pro cameras. Within this update, FLIR stated that the FLIR ONE Pro does not offer the reliability and accuracy needed to detect elevated skin temperatures or fevers. FLIR recommended that developers purchase its more expensive FLIR EST thermal camera solutions. FLIR also stated that it was "working hard to find a really good, lower cost solution." This statement, like FLIR's statements to IPVM, have the

effect of disparaging X.Labs' FEEVR system, including its reliability and accuracy to perform elevated skin temperature readings.

63.    Finally, on June 29, 2020, various media outlets reported that FLIR had already started to deliver a more expensive elevated skin temperature screening product, providing a school in Honolulu with a thermal imaging system that would "look for elevated screen temperature across individuals who may be eligible for secondary screening." It was further reported that this unit costs between $7,000 to $12,000 and was already in use at the Hawaii convention center and state capital. FLIR's statement also quoted Mr. Oberholzer regarding X.Labs' use of the FEEVR system that FLIR had criticized X.Labs for not less than 2 months before.

**FLIR is Injured as a Result**

64.    As a direct and proximate result of FLIR's conduct described above, X.Labs has suffered injuries and damages in an amount to be proven at trial of no less than $1 million, but exceeding the minimum jurisdictional requirement of this Court. Specifically:

    a. Since the publication of the IPVM articles identified herein, a publicly traded web hosting company put its 100-unit order of the FEEVR system on hold, resulting in a $350,000 revenue loss for X. Labs.

    b. On April 14, 2020, an American social media corporation customer and a Japanese e-commerce company each suspended their orders of the FEEVR system resulting in a $750,000  revenue loss for X.Labs.

65.    In addition, numerous potential customers of the FEEVR systems have raised serious concerns about the FEEVR system and cited the IPVM Articles containing FLIR's false and misleading statements as the bases of those concerns. Specifically:

    a. On April 14, 2020, a VP of Compliance at a Japanese e-commerce company cited and expressed concern about the April 14, 2020 article.

b. On April 16, 2020, an Exxon Mobil representative called an X.Labs' distributor asking about the IPVM articles.

c. On May 4, 2020, a Bank of America Business Security Manager inquired about the IPVM "reports" and requested that X.Labs respond to the points raised by the IPVM articles.

d. On May 11, 2020 a U.S. Foods representative requested an explanation of the May 7, 2020 IPVM article and the alleged "cancellation" of the 2020 PSA between FLIR and X.Labs.

e. On May 11, 2020, a Coca-Cola Director of Hospitality & Site Services asked if X.Labs could "speak to" IPVM's May 7, 2020 article.

f. On May 21, 2020, the Flex-N-Gate group's Director of Global Security Operations cited the May 29, 2929 article as a "concerning article" and "raising concern internally."

g. On May 21, 2020, Major League Baseball cited "concerns" arising out of IPVM's May 20, 2020 article.

66.    FLIR has and continues to suffer these and other similar injuries and damages.


**FIRST CAUSE OF ACTION**

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

**(By X.Labs as against FLIR Systems, Inc.)**

67.    X.Labs incorporates by reference each and every allegation contained in Paragraphs 1 through 66 above.

68.    There is an implied covenant of good faith and fair dealing in the 2018 and 2020 PSAs and the March 13, 2020 purchase order whereby both X. Labs and FLIR are obligated to refrain from engaging in bad faith or unfair dealing achieved by deceit or misrepresentation in falsifying or manipulating the parties' relationship to

create fictitious grounds to terminate the 2018 and 2020 PSA. Furthermore, FLIR had an obligation that all discretionary decisions made under the 2018 PSA, 2020 PSA, and the March 13, 2020 purchase order be exercised in good faith and consistent with the reasonable expectations of the parties.

69.    X.Labs performed all of its required obligations, covenants, and conditions except to the extent those obligations, covenants, and conditions were waived, excused, or rendered impossible by FLIR.

70.    FLIR breached the implied covenant of good faith and fair dealing in the parties' agreements by manufacturing false reasons in order to establish a fictitious basis for termination. FLIR unleashed a campaign via IPVM to discredit X.Labs by creating fictitious negative information concerning X.Labs and intentionally misleading IPVM's members and subscribers regarding the FEEVR system's accuracy and capabilities. FLIR sought to create a false record so it could terminate the March 13, 2020 purchase order and the 2020 PSA. FLIR committed these acts intentionally, for its own benefit, and for the improper purpose of attempting to remove X.Labs from the market.

71.    X.Labs' harm derives from FLIR's creation of the false grounds to terminate the 2020 PSA and the publication of the IPVM articles, which constitutes arbitrary and unreasonable conduct which prevented X.Labs from receiving the fruits of its bargain. As the direct and proximate result of FLIR's breach, X.Labs suffered and continues to suffer damages in an amount to be determined at trial of no less than $1 million, but in any event in excess of the jurisdictional limit of this Court.

## SECOND CAUSE OF ACTION

### FRAUDULENT INDUCEMENT

### (By X.Labs as against FLIR Systems, Inc.)

72.    X.Labs incorporates by reference each and every allegation contained in Paragraphs 1 through 66 above.

73.     Through the e-mails and other communications alleged above, FLIR, by and through its agents and employees described above, falsely represented: (1) it would perform under the March 17, 2020 Order Acknowledgement and without any product restrictions, upon which X.Labs detrimentally relied; (2)"OEM support" required X.Labs to sign the 2020 PSA; (3) the 2020 PSA was based on the "same schedule" as the 2018 PSA; (4) the basis for invoking the improper unilateral cancellation provision to cancel the 2020 PSA and prior Order Acknowledgement without cause; and (5) the functionality and accuracy of systems, such as the FEEVR system, utilizing its FLIR ONE Pro cameras as components of such systems. Each of the foregoing were made in an effort to prevent or delay X.Labs' ability to utilize the FLIR ONE Pro camera as a component of its FEEVR system to give FLIR an unfair competitive advantage.

74.     FLIR's representations were false when made. FLIR's promises were made without any intention of performing them. FLIR's promises were made with the intention of defrauding X.Labs.

75.     X.Labs detrimentally relied on FLIR's fraudulent misrepresentations and promises by entering into the contract for the purchase of the 5,000 units of FLIR ONE Pro cameras and entering into the 2020 PSA, only to be prevented or delayed from selling its FEEVR system so that FLIR could gain an unfair competitive advantage  for its own profit and benefit.

76.     As a direct and proximate cause of its wrongful acts, FLIR has been unjustly enriched, and X.Labs has been damaged in an amount to be proven at trial of no less than $1 million, but in any event in excess of the jurisdictional limit of this Court.

77.     FLIR's wrongful conduct and actions alleged above were intentional, deliberate and/or in conscious disregard of the rights of X.Labs, and FLIR was guilty of fraud, oppression and/or malice toward X.Labs, in that: (1) FLIR intentionally represented it would perform under the 2020 PSA and Order Acknowledgement while

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

concealing its intention not to perform its obligations under the 2020 PSA and Order Acknowledgement; and (2) intentionally misrepresented the accuracy and capabilities of certain systems using the FLIR ONE Pro camera, such as the FEEVR system, while having actual or constructive knowledge regarding the falsity of these statements. X.Labs is therefore entitled to recover exemplary and punitive damages pursuant to Cal. Civ. Code section 3294, in an amount according to proof at trial, as against FLIR.

## THIRD CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS AND/OR PROSPECTIVE ECONOMIC ADVANTAGE

### (By X.Labs as against FLIR Systems, Inc.)

78.     X.Labs incorporates by reference each and every allegation contained in Paragraphs 1 through 66 above.

79.     At all relevant times, FLIR knew of the existence of the valid and enforceable customer agreements and/or prospective business or economic relationships between X.Labs and its customers and purchasers of X.Labs' FEEVR system.

80.     FLIR intentionally interfered with X.Labs' performance under its customer contracts and/or prospective business or economic relationships alleged above by engaging in the wrongful conduct and acts alleged above.

81.     FLIR's wrongful conduct and actions alleged above were intentional, deliberate and/or in conscious disregard of the rights of X.Labs, and FLIR is guilty of fraud, oppression and/or malice toward X.Labs, in that: (1) FLIR intentionally represented it would perform under the 2020 PSA and Order Acknowledgement while concealing its intention not to perform its obligations under the 2020 PSA and Order Acknowledgement; and (2) intentionally misrepresented the accuracy and capabilities of certain systems using the FLIR ONE Pro camera, such as the FEEVR system, while having actual or constructive knowledge regarding the falsity of these statements.

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

X.Labs is therefore entitled to recover exemplary and punitive damages pursuant to Cal. Civ. Code section 3294, in an amount according to proof at trial, as against FLIR.

### FOURTH CAUSE OF ACTION

### UNFAIR BUSINESS PRACTICES IN VIOLATION OF BUSINESS AND PROFESSIONS CODE §§ 17200, ET SEQ.

### (By X.Labs as against FLIR Systems, Inc.)

82.     X.Labs incorporates by reference each and every allegation contained in Paragraphs 1 through 66 above.

83.     By invoking unconscionable unilateral, illusory, and unenforceable termination for convenience provisions in the parties' agreements in violation of Cal. Civ. Code sections 1580 and 1670.5, by attempting to contractually prohibit intentional fraud and other tort claims in violation of Cal. Civ. Code section 1668, by attempting to contractually limit recovery of damages, including punitive damages, for intentional fraud and other tort claims in violation of Cal. Civ. Code section 1668, and by engaging in fraud and intentional interference with contractual relations and/or prospective economic advantage, as alleged above, in order to prevent or delay X.Labs from selling its FEEVR system in order to gain an unfair competitive advantage over X.Labs for itself, FLIR has engaged in unlawful, unfair, and fraudulent business practices in violation of section 17200 et seq. of the California Business and Professions Code.

84.     Specifically, in both coordinating and causing the IPVM articles to be published, FLIR committed unlawful acts that were defamatory and trade libelous in violation of 15 U.S.C. § 1125(a) et seq., FLIR's conduct was fraudulent because FLIR knowingly and falsely misrepresented the accuracy and capabilities of the FEEVR System and as described in ¶¶ 73-77, *supra*.

85.     As a direct and proximate result of FLIR's above-alleged unfair business practices, X.Labs is entitled to an accounting, restitution, disgorgement, and/or restoration, of all monies it has paid as well as any profits FLIR has received or will

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

receive as a result of its unfair business practices in an amount to be proven at trial, plus prejudgment interest at the legal rate, as well as injunctive relief enjoining FLIR from further engaging in those unfair business practices and from competing with X.Labs with respect to X.Labs' FEEVR system.

86.    FLIR's wrongful conduct and actions alleged above were intentional, deliberate and/or in conscious disregard of the rights of X.Labs, and FLIR is guilty of fraud, oppression and/or malice toward X.Labs, in that: (1) FLIR intentionally represented it would perform under the 2020 PSA and Order Acknowledgement while concealing its intention not to perform its obligations under the 2020 PSA and Order Acknowledgement; and (2) intentionally misrepresented the accuracy and capabilities of certain systems using the FLIR ONE Pro camera, such as the FEEVR system, while having actual or constructive knowledge regarding the falsity of these statements. X.Labs is therefore entitled to recover exemplary and punitive damages pursuant to Cal. Civ. Code section 3294, in an amount according to proof at trial, as against FLIR.

## FIFTH CAUSE OF ACTION

### UNFAIR COMPETITION THROUGH FALSE ADVERTISING

### UNDER LANHAM ACT § 43(a)(1) (15 U.S.C. § 1125(a)(1))

**(By X.Labs as against FLIR Systems, Inc.)**

87.    X.Labs incorporates by reference each and every allegation contained in Paragraphs 1 through 66 above.

88.    FLIR falsely or misleadingly described or represented in commercial advertising or promotion the accuracy, functionality, and possible applications of:

    a.  Systems utilizing FLIR ONE Pro cameras as components of such systems, such as X.Labs' FEEVR system;

    b.  X.Labs' FEEVR system;

    c.  X.Labs' use of the FLIR ONE Pro camera; and

    d.  FLIR's status as a component supplier for X.Labs.

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

FLIR did so in order to delay or prevent X.Labs from marketing or selling its FEEVR system and secure for itself an unfair competitive advantage to market and sell its own competitive product.

89.     FLIR's deceptions were material because they influenced the purchasing decisions of potential buyers of the FEEVR system.

90.     The above-described acts of FLIR constitute false and misleading descriptions or representations that deceive or are likely to deceive customers or potential customers of X.Labs in interstate commerce in a material way.

91.     On information and belief, FLIR has an economic incentive to make such false and misleading descriptions and cause the IPVM articles to be published because, among other things, FLIR sought to engage in anti-competitive behavior to remove X.Labs from offering a low-cost alternative to FLIR's more expensive thermal imaging systems. FLIR would also economically benefit from the misrepresentations about the FEEVR system. FLIR's conduct deceived and, on information and belief, are likely to deceive X.Labs' customers and prospective customers, suppliers, and development partners. Indeed, numerous X.Labs customers have terminated or suspended their sales agreements for the FEEVR system, citing the IPVM articles containing FLIR's false and misleading statements as a reason.

92.     On information and belief, in addition to the benefits flowing to FLIR arising out of the conduct described above, FLIR has a business interest in publishing these false, misleading, and deceptive statements and misrepresentations regarding the FEEVR system because it generates more customers for FLIR's own competing thermal systems and more customers and subscribers for IPVM, at least some of which, on information and belief, are customers or potential customers of FLIR's own competing thermal systems.

93.     X.Labs has been particularly injured as a result of FLIR's conduct in the form of lost sales, market share and asset value of X.Labs including specific lost customers and potential customers.

94.    FLIR's above-alleged conduct has caused great and irreparable injury to X.Labs, and unless such conduct is enjoined, X.Labs will continue to suffer great and irreparable injury.

95.    FLIR's continued false or misleading representations and advertising were made in conscious disregard of X.Labs' rights, entitling X.Labs to an award of FLIR's profits, up to three times X.Labs' actual damages, and X.Labs' attorneys' fees in bringing and maintaining this action, pursuant to 15 U.S.C. section 1117(a).

### SIXTH CAUSE OF ACTION

**UNFAIR COMPETITION THROUGH FALSE ADVERTISING**

**UNDER BUSINESS AND PROFESSIONS CODE §§ 17500, ET SEQ.**

**(By X.Labs as against FLIR Systems, Inc.)**

96.    X.Labs incorporates by reference each and every allegation contained in Paragraphs 1 through 66 above.

97.    By falsely or misleadingly describing or representing in commercial advertising or promotion the accuracy, functionality, and possible applications of systems, such as X.Labs' FEEVR system, utilizing the FLIR ONE Pro cameras as components of such systems, as well as the accuracy, functionality, application, and purpose of X.Labs' FEEVR system in order to delay or prevent X.Labs from marketing or selling its FEEVR system and secure for itself an unfair competitive advantage to market and sell its own competitive product in violation of 15 U.S.C. section 1125(a)(1), FLIR also violated California Business and Professions Code section 17500, et seq.

98.    On information and belief, FLIR has an economic incentive to make such false and misleading descriptions and cause the IPVM articles to be published because, among other things, FLIR sought to be in a competitive position with X.Labs. FLIR would also economically benefit from the misrepresentations about the FEEVR system. FLIR's conduct and statements deceived and, on information and belief, are likely to deceive X.Labs' customers and prospective customers, suppliers, and

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

development partners. Indeed, numerous X.Labs customers have terminated or suspended their sales agreements for the FEEVR system, citing IPVM's articles containing FLIR's false and misleading statements as a reason.

99.    On information and belief, in addition to the benefits flowing to FLIR from arising out of the conduct described above, FLIR has a business interest in publishing these false, misleading and deceptive statements and misrepresentations regarding the FEEVR system by generating increased customers for itself and additional members and subscribers for IPVM, at least some of which, on information and belief, are customers or potential customers of FLIR's own competing thermal systems.

100.   FLIR's above-alleged conduct has caused great and irreparable injury to X.Labs, and unless such conduct is enjoined, X.Labs will continue to suffer great and irreparable injury.

101.   FLIR's continued false and misleading representations and advertising entitles X.Labs' to restitution of monies it paid, disgorgement of FLIR's profits, and injunctive relief pursuant to California Business and Professions Code section 17535.

102.   FLIR's wrongful conduct and actions alleged above were intentional, deliberate and/or in conscious disregard of the rights of X.Labs, and FLIR is guilty of fraud, oppression and/or malice toward X.Labs, in that: 1) FLIR intentionally represented it would perform under the 2020 PSA and Order Acknowledgement while concealing its intention not to perform its obligations under the 2020 PSA and Order Acknowledgement; and 2) intentionally misrepresented the accuracy and capabilities of certain systems using the FLIR ONE Pro camera, such as the FEEVR system, while having actual or constructive knowledge regarding the falsity of these statements. X.Labs is therefore entitled to recover exemplary and punitive damages pursuant to Cal. Civ. Code section 3294, in an amount according to proof at trial, as against FLIR.

## **REQUEST FOR RELIEF**

X.Labs requests judgment against FLIR as follows:

1.   For restitution of amounts it paid to FLIR and incurred in reliance on its agreements with FLIR;

2.   For lost profit damages in an amount in excess of the jurisdictional minimum, according to proof;

3.   For actual damages for injury to X.Labs due to FLIR's wrongful conduct;

4.   For interest on such damages and restitution at the legal rate;

5.   For injunctive relief against FLIR to enjoin FLIR's unfair business practices and false or misleading representations and advertising;

6.   For punitive damages under Cal. Civ. Code section 3294 as the conduct complained herein was the result of fraud, oppression and/or malice;

7.   For its attorneys' fees in bringing and maintaining this action, an award of FLIR's profits, and treble damages pursuant to 15 U.S.C. section 1117(a);

8.   For costs of suit incurred herein; and

9.   For such other and further relief as the Court may deem just and proper.

Dated: October 23, 2020                    CYPRESS LLP


___/s/ Stephen J. Kelly_____
Robert J. Muller
Stephen J. Kelly

Attorneys for Plaintiff Royal Holdings
Technologies Corporation, d/b/a X.Labs

C Y P R E S S   L L P
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123