UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.: | 2:20-cv-09015-SB (PLAx) | Date: | 1/8/2021 |
|---|---|---|---|

| Title: | *Royal Holdings Technologies Corp. v. FLIR Systems, Inc.* |
|---|---|

| Present: The Honorable | **STANLEY BLUMENFELD, JR., U.S. District Judge** |
|---|---|

| Victor Cruz | Katie Thibodeaux |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| Stephen J. Kelly | Bradford K. Newman |
| Robert J. Muller | Teresa H. Michaud |

**Proceedings:** **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS (DKT. NO. 17)**

Before the Court is the motion to dismiss filed by Defendant FLIR Systems, Inc. ("Defendant" or "FLIR"). (Mot., Dkt. No. 17-1.) Plaintiff Royal Holdings Technologies Corporation, d/b/a X.Labs ("Plaintiff" or "X.Labs") opposes. (Opp., Dkt. No. 18.) Defendant has replied. (Reply, Dkt. No. 19.) For the reasons below, the Court **GRANTS** the motion.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

A.   **Launch of FEEVR**

Plaintiff claims to be an award-winning technology company specializing in the public health and safety sectors. (First Amended Complaint ("FAC"), ¶ 15, Dkt. No. 14.) Among Plaintiff's alleged innovations is a "smartphone-based security scanning and weapons detection system" called the "SWORD" system. (*Id.* ¶ 16.) The SWORD system utilizes Plaintiff's proprietary AI algorithm and a

"FLIR ONE Pro" camera to detect metallic and non-metallic weapons. (*Id.* ¶¶ 16-17.) Plaintiff contracted with Defendant to supply FLIR ONE Pro cameras under a product supply agreement in October 2018 ("2018 PSA"). (*Id.* ¶¶ 3, 18.)

At the onset of the COVID-19 pandemic, Plaintiff decided to utilize its knowledge from the SWORD system to develop FEEVR, a non-contact screening system for detecting individuals with elevated skin temperature. (*Id.* ¶ 20.) Like SWORD, FEEVR uses Plaintiff's proprietary AI together with a FLIR ONE Pro camera. (*Id.*) FEEVR does not use the FLIR Software Development Kit ("SDK"), and Plaintiff "expressly disclaims" that FEEVR is FDA approved or intended for medical use. (*Id.* ¶ 21.) Rather, FEEVR is intended to be used as a preliminary screening device that can be widely adopted due to its cost efficiency. (*Id.* ¶¶ 21-22.) Anticipating exponential market demand, Plaintiff ordered 5,000 FLIR ONE Pro cameras on March 13, 2020 and announced the launch of FEEVR on March 25, 2020. (*Id.* ¶¶ 23-24.)

### B.   The FLIR ONE Pro Camera

The FLIR ONE Pro "is a low-cost, professional-grade thermal camera adapted for use with a smartphone system." (*Id.* ¶ 25.) It uses a sensor to capture infrared light and then processes the input into a heat signature. (*Id.* ¶ 26.) Plaintiff chose to use the FLIR ONE Pro because its low price (approximately $300) and smartphone adaptability would enable Plaintiff to keep the cost of FEEVR down. (*Id.* ¶ 27.) Defendant advertises the FLIR ONE Pro as having an accuracy rating of ± 3° Celsius. (*Id.* ¶ 28.) Plaintiff alleges that Defendant "knew or should have known" that the accuracy of the FLIR ONE Pro could be substantially enhanced by a system that uses artificial intelligence ("AI"), such as FEEVR. (*Id.* ¶ 29.) According to Plaintiff, "the FEEVR system uses AI-based logical reasoning to identify the specific region of an individual's forehead that has a direct correlation to the temporal artery; detect the skin temperature of that region; and disregard other temperatures in the field of view." (*Id.*)

### C.   The IPVM Articles

Plaintiff alleges that after the March 2020 Order, Defendant recognized the market opportunity for screening systems like FEEVR and planned to remove Plaintiff's product from the market to sell its own, more expensive thermal cameras. (*Id.* ¶ 31.) To accomplish this objective, Defendant allegedly coordinated with IP Video Marketing Info, Inc. ("IPVM"), a group of journalists and video technology specialists, to publish a series of articles with "false,

misleading, and defamatory statements concerning the FEEVR system and X.Labs' reputation." (*Id.* ¶¶ 4, 31-32.) Between March 31, 2020 and May 20, 2020, IPVM published four articles discussing the FEEVR system, some of which included commentary from Defendant. (*Id.* ¶¶ 33-38.)

### D. The 2020 PSA and Termination

On April 15, 2020, Defendant's National Sales Manager, Todd Faulkner, emailed Plaintiff's CEO, Barry Oberholzer, to inform him that Defendant had cancelled the 2018 PSA and that the parties needed to enter into a new PSA ("2020 PSA"). (*Id.* ¶ 39.) Though Defendant represented that the 2020 PSA would have the "same schedule" as the 2018 PSA, the 2020 PSA contained a new purchasing condition that prohibited the "Medical Use" of the FLIR ONE Pro cameras by Plaintiff. (*Id.* ¶ 40.) The medical use restriction also applied retroactively to Plaintiff's March 13, 2020 order. (*Id.*) "Faced with FLIR's substantially superior bargaining power," Plaintiff executed the 2020 PSA on April 15, 2020. (*Id.*) In a separate email exchange, Mr. Oberholzer responded to concerns about the medical use of FEEVR, noting that Plaintiff's website contained a disclaimer. (*Id.* ¶¶ 41-42.)

On May 18, 2020, Mr. Oberholzer received a letter from Defendant's deputy general counsel, Chris Lewis, stating that Defendant was terminating the 2020 PSA because Plaintiff was violating the FLIR ONE Pro software license. (*Id.* ¶ 47.) Despite the termination having an effective date of May 28, Plaintiff did not receive the cameras that should have been shipped on May 15, 2020 and May 20, 2020. (*Id.* ¶¶ 48-52.) On May 20, 2020, IPVM published an article titled "FLIR Cancelling Contracts with X. Labs / Feevr." (*Id.* ¶ 53.)

On May 21, 2020, Plaintiff received additional correspondence from Mr. Lewis that stated Defendant chose to terminate the 2018 PSA based on its "internal position not to market, promote, or enable use of the FLIR ONE Pro for health- and medical-related uses including elevated body temperature screening." (*Id.* ¶ 54.) This position was not previously provided by Mr. Faulkner at the time the parties executed the 2020 PSA. (*Id.*)

### E. Defendant Offers Product to Compete with FEEVR

At some point during the time Defendant was supplying the cameras to Plaintiff, Defendant applied to the U.S. Patent and Trademark Office for the "EST" trademark for the term "Elevated Skin Temperature." (*Id.* ¶ 61.) In June 2020,

Defendant issued a "developer update" that stated the FLIR ONE Pro was not sufficiently accurate to detect elevated skin temperatures, and that developers instead should purchase the more expensive "FLIR EST."  (*Id.* ¶ 62.)  On June 29, 2020, media outlets reported that Defendant had already delivered a screening product that costs between $7,000 to $12,000.  (*Id.* ¶ 63.)

### F.  <u>Procedural History</u>

On August 28, 2020, Plaintiff sued Defendant in Los Angeles County Superior Court, bringing six claims for:  (1) breach of implied covenant of good faith and fair dealing; (2) fraudulent inducement; (3) intentional interference with contractual relations and/or prospective economic advantage; (4) unfair practices in violation of Business and Professions Code §§ 17200 *et seq.*; (5) unfair competition through false advertising in business in violation of section 43(a)(1) of the Lanham Act (15 U.S.C. § 1125(a)(1)); and (6) false advertising in violation of Business and Professions Code §§ 17500 *et seq.*  (Compl., Dkt. No. 1-3.)  Defendant removed the action to federal court on September 30, 2020.  (Not. of Removal, Dkt. No. 1.)  After Defendant moved to dismiss the complaint on October 2, 2020 (Dkt. No. 6), Plaintiff filed its FAC, asserting the same six claims, on October 13, 2020.  (Dkt. No. 14.)  Defendant filed the instant motion on November 13, 2020.  (Dkt. No. 17.)

## II.  <u>LEGAL STANDARD</u>

To survive a motion to dismiss, a complaint must contain sufficient factual material to "state a claim that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In analyzing the complaint's sufficiency, a court credits all factual allegations and interprets them generously in favor of the plaintiff. *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1014 (9th Cir. 2012).  Legal conclusions are not owed the same deference. *Iqbal*, 56 U.S. at 678.  When fraud is alleged, it must be pleaded with particularity (Fed. R. Civ. P. 9(b)), requiring the pleading party to specify all aspects of the fraud—including the "who, what, when, where, and how" of the alleged misconduct. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997).

## III.     DISCUSSION

Defendant moves to dismiss each of Plaintiff's claims.  The Court addresses each in turn.

### A.     Plaintiff's Breach of Implied Covenant of Good Faith and Fair Dealing is Barred by the Express Terms of the PSAs.

The parties agree that Delaware law governs the 2018 and 2020 PSAs. (Mot. at 10; Opp. at 6.)  Under Delaware law, the implied covenant attaches to all contracts and "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (internal quotations omitted).  The implied covenant does not apply when "the subject at issue is expressly covered by the contract." *Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del. Ch. 1992), *aff'd*, 609 A.2d 668 (Del. 1992).  The covenant only applies to fill the gaps in a contract and may not contradict the express language of the agreement. *See Alliance Data Sys. Corp. v. Blackstone Capital Partners V L.P.*, 963 A.2d 746, 770 (Del. Ch. 2009), *aff'd*, 976 A.2d 170 (Del. 2009).  "The doctrine thus operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an answer.  In the Venn diagram of contract cases, the area of overlap is quite small." *Airborne Health, Inc. v. Squid Soap LP*, 984 A.2d 126, 146 (Del. Ch. 2009).

In its first cause of action, Plaintiff contends that Plaintiff violated the implied covenant by "manufacturing false reasons in order to establish a fictitious basis for termination" (FAC ¶¶ 68, 70) and "unleash[ing] a campaign via IPVM to discredit X.Labs by creating fictitious negative information concerning X.Labs and intentionally misleading IPVM's members and subscribers regarding the FEEVR system's accuracy and capabilities."  (*Id.* ¶ 70; *see also id.* ¶ 73 (asserting fraud in cancelling the 2020 PSA "without cause").  This contention, however, cannot be squared with Defendant's right—expressly granted in the PSAs—to terminate the agreements at will.  Section 9.3 of the PSAs provides that "FLIR may terminate this Agreement and/or any Product Schedule *without cause* upon 10 days prior written notice to Company or such other period of notice as may be required by

law." (*See* Declaration of Paul Kushnerov ("Kushnerov Decl."), ¶¶ 3, 5, Exs. 1, 3, Dkt. No 17-4 (emphasis added).)[1]

By arguing that Defendant manufactured reasons for terminating the PSAs, Plaintiff asks this Court to rewrite the agreements rather than to fill gaps left open by the parties. The parties expressly agreed that Defendant did not have to manufacture anything at all to terminate the agreements—notice was all that was required. In this circumstance, the "mere exercise of [a] contractual right to terminate [an agreement], without more, does not constitute a breach of [the] implied covenant of good faith and fair dealing." *Gilbert v. El Paso Co.*, 575 A.2d 1131, 1143 (Del. 1990) (citing *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 957 (5th Cir. 1981)). Plaintiff has not cited any case to the contrary. *See Gerber Enter. Prod. Holdings, LLC*, 67 A.3d 400, 420 & 422 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013) (finding a "gap" in the agreement and inquiring what the parties would have done "had [they] addressed the issue at the time of contracting"). Accordingly, Defendant's motion to dismiss Plaintiff's first claim is **GRANTED**.

### B. <u>Plaintiff's Fraudulent Inducement Claim Fails.</u>

Plaintiff next asserts a claim for fraudulent inducement. Under California law, "[t]he elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996) (citations omitted).[2] Defendant argues that Plaintiff's fraudulent inducement claim is barred by the economic loss rule and otherwise fails to meet Rule 9(b)'s heightened pleading standard. (Mot. at 12-16.)

The economic loss rule "generally bars tort claims for contract breaches." *United Guar. Mortg. Indem. Co. v. Countrywide Fin. Grp.*, 660 F. Supp. 2d 1123, 1180 (C.D. Cal. 2009); *see Elrich v. Menzes*, 21 Cal. 4th 543, 551 (1999)

---

[1] Each of the exhibits in the Kushnerov Declaration are incorporated into the FAC by reference and are therefore appropriate for judicial notice. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

[2] After agreeing that Delaware law applies under the PSAs, the parties inexplicably rely on California law here and elsewhere in the motion. The Court therefore will assume that California law applies where there is no dispute about its application.

("[C]onduct amounting to a breach of contract becomes tortious only when it violates a duty independent of the contract arising from principles of tort law."). "Allowing parties to essentially recover for breach of contract in tort undermines the 'predictability' that parties seek when they enter into a contract." *Body Jewelz, Inc. v. Valley Forge Ins. Co.*, 241 F. Supp. 3d 1084, 1093 (C.D. Cal. 2017).  Thus, the economic loss rule bars Plaintiff's claim unless it alleges that Defendant violated some independent, non-contractual duty.

Plaintiff argues that "fraudulent inducement is a well-settled exception to the economic loss rule."  (Opp. at 10 (quoting *Lee v. Fed. St. L.A., LLC*, No. 2:14-cv-06264-CAS (SSx), 2016 WL 2354835, at *8 (C.D. Cal. May 3, 2016).)  California law supports this assertion:  "The economic loss rule poses no barrier to a properly pled fraudulent inducement claim: '[I]t has long been the rule that where a contract is secured by fraudulent representations, the injured party may elect to affirm the contract and sue for fraud.'"  *United Guar.*, 660 F. Supp. 2d at 1188 (quoting *Lazar*, 12 Cal. 4th at 645).  However, "the terms of a contract cannot form the basis of a fraudulent inducement claim for purposes of the economic loss rule."  *Lee*, 2016 WL 2354835 at *9.

Plaintiff alleges five false representations:  (1) Defendant promised to "perform under the March 17, 2020 Order Acknowledgement and without any product restrictions"; (2) a division of Defendant, "OEM support," required Plaintiff to sign the 2020 PSA; (3) the 2020 PSA had the "same schedule" as the prior contract; (4) "the basis for invoking the improper unilateral cancellation provision to cancel the 2020 PSA and prior Order Acknowledgement without cause"; and (5) that Defendant misrepresented the accuracy and functionality of the FEEVR system.  (FAC ¶ 73.)  Defendant argues that each of these representations allege failure to perform and improper cancellation, not fraudulent inducement.  (Mot. at 13; Reply at 6.)

Defendant is at least partly correct.  The cancellation of the 2020 PSA "without cause" and its statements about the FEEVR system (FAC ¶ 73), conduct allegedly occurring after signing the agreement, do not appear to allege any act of fraudulent inducement to enter into that agreement.  The remaining allegations are too vague to fully analyze whether they are barred by the economic loss rule.  It is unclear how Plaintiff was fraudulently induced into signing the 2020 PSA by a promise to "perform under the March 17, 2020 Order Acknowledgement and without any product restrictions" or by the purported wishes of "OEM Support" or by a promise to maintain the "same schedule."  Such ambiguity requires dismissal for failure to satisfy the Rule 9(b) standard.  *See Cooper*, 137 F.3d at 627

(requiring details about the "who, what, when, where, and how" of the alleged fraud). Accordingly, Defendant's motion to dismiss Plaintiff's second cause of action is **GRANTED**.

### C. Plaintiff's Intentional Interference Claims Fail.

In its third cause of action, Plaintiff improperly combines two claims. *See* Fed. R. Civ. P. 10(b) (requiring each claim to be stated in a separate count). To state a claim for intentional interference with contractual relations, Plaintiff must show: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990). To state a claim for intentional interference with prospective economic relations, Plaintiff must show "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Youst v. Longo*, 43 Cal. 3d 64, 71 n. 6 (1987). In addition, Plaintiff must establish that Defendant "engaged in conduct that was wrongful by some legal measure other than the fact of interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.* 11 Cal. 4th 376, 393 (1995).

Plaintiff alleges that after the IPVM published negative articles about the FEEVR system, "a publicly traded web hosting company . . . [,] an American social media corporation customer[,] and a Japanese e-commerce company each suspended their orders. . . ." (FAC ¶ 64.) Plaintiff alleges that "numerous potential customers" also "raised serious concerns" about the IPVM articles. (*Id.* ¶ 65.) Among those raising concerns were "a Japanese e-commerce company," Exxon Mobil, Bank of America, U.S. Foods, Coca-Cola, Flex-N-Gate, and Major League Baseball. (*Id.* ¶¶ 65(a)-(g).) Plaintiff alleges that "FLIR knew of the existence of the valid and enforceable customer agreements and/or prospective business or economic relationships between X.Labs and its customers and purchasers of X.Labs' FEEVR system." (*Id.* ¶ 79.)

Plaintiff's allegations fail on multiple levels. The majority of Plaintiff's allegations about "potential customers" are too speculative to support its prospective economic advantage claim. Conclusorily labeling those relationships

as "existing and continuing" in an opposition brief (Opp. at 12) does not cure the pleading deficiency. Plaintiff's conclusory allegations about the three orders from the unnamed companies also fail to satisfy the *Twombly/Iqbal* standard. Nor is it sufficient to generally allege that Defendant knew about Plaintiff's contracts. (Opp. at 11 (citing *Silicon Knights v. Crystal Dynamics*, 983 F. Supp. 1303, 1310 (N.D. Cal. 1997).) *Silicon Knights* does not stand for this broad principle. The plaintiff in that case identified specific contracts and contract terms, alleged knowledge about those contracts, and detailed the tortious acts taken. 983 F. Supp. at 1309-10. Plaintiff does not allege a similar level of detail, as required by California law and federal pleading rules. California law requires an intent to interfere with a known contract; and, therefore, a plaintiff must allege enough detail to demonstrate the requisite knowledge and intent. *See Davis v. Nadrich*, 174 Cal. App. 4th 1, 10-11 (2009) ("[Plaintiff] cannot prove the tort of interference with contract because he has not brought forth any facts to show that [Defendant] was aware of the details of [the contract] to form an intent to harm it."); *see also Winchester Mystery House, LLC v. Global Asylum, Inc.*, 210 Cal. App. 4th 579, 596-97 (2012) (finding that plaintiff could not sustain an interference claim without establishing that defendant had knowledge of the specific contract terms at issue). Plaintiff must have more to allege if it wishes to proceed further with these claims.

Defendant's motion to dismiss Plaintiff's third cause of action is **GRANTED** for combining two claims into one and for failing to satisfy the *Twombly/Iqbal* standard as applied to these California claims.

### D. Plaintiff's False Advertising Claims under the Lanham Act and FAL Fail.

Under section 43(a) of the Lanham Act, there are "two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B). *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014). To state a claim for false advertising, Plaintiff must show "an injury to a commercial interest in reputation or sales" and "economic or reputational injury flowing directly from the deception wrought by the defendant's advertising." *Id.* at 132, 134. For representations to constitute commercial advertisement, "they must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services . . . [and] (4) must be disseminated sufficiently to the relevant purchasing public. . . ." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999). To state a claim for false advertising under

California Business and Professions Code § 17500 ("FAL"), Plaintiff must allege: "(1) An untrue or misleading statement; (2) Which is known, or reasonably should be known, to be untrue or misleading; and (3) Is made to dispose of goods, perform services, or induce obligations." *Arakelian v. Mercedes-Benz USA, LLC*, No. CV 17-06240 TJH (RAOx), 2018 WL 6422649, at *4 (C.D. Cal. June 4, 2018).

Plaintiff's Lanham Act and FAL claims sound in fraud and are therefore subject to Rule 9(b)'s heightened pleading requirements. *See EcoDisc Technology AG v. DVD Format/Logo Licensing Corp.*, 711 F. Supp. 2d 1074, 1084 (C.D. Cal. 2010) (applying Rule 9(b) to Lanham Act claims); *Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1117, 1122-23 (C.D. Cal. 2010) (applying Rule 9(b) to FAL claims). The Court analyzes Plaintiff's Lanham Act and FAL claims together because the two claims are predicated on the same facts and the two legal theories are "substantially congruent." *R&A Synergy LLC v. Spanx, Inc.*, No. 2:17-cv-09147-SVW-AS, 2019 WL 4390564, at *15 (quoting *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994)).

Plaintiff alleges three categories of false advertisements and descriptions: (1) Defendant's statements about FEEVR and similar systems, (2) Defendant's statements about the capabilities of the FLIR ONE Pro, and (3) Defendant's statements about its status as Plaintiff's product supplier. (FAC ¶¶ 88(a)-(d).) Defendant argues that Plaintiff's claims fail because its statements were either true and therefore nonactionable or not attributable to Defendant. (Mot. at 17-19.) The Court agrees.

First, Plaintiff has failed to identify an actionable statement about FEEVR attributable to Defendant. Plaintiff's FAC identifies numerous statements about FEEVR, including that it "fundamentally lacks accuracy for its intended use, as [Defendant] has said and IPVM testing has shown." (FAC ¶ 35.) Even attributing this statement to Defendant (and not IPVM), it still falls short of Rule 9(b)'s standard because it does not identify the speaker. The other statement that FEEVR is "10x less accurate than" an FDA approved device (*id.* ¶ 37) is attributable solely to IPVM. To the extent that Plaintiff asserts that Defendant is liable for IPVM's statements due to some coordinated scheme with IPVM tantamount to a civil conspiracy, those allegations are inadequate. (Opp. at 16-17; FAC ¶¶ 5, 31, 33, 35, 37-38, 53.) Plaintiff does not bring a civil conspiracy cause of action, and the sole evidence of this coordination is that Defendant is an IPVM subscriber. (*Id.* ¶ 5.) Such allegations do not satisfy Rule 9(b)'s specificity requirements. *See Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007) (applying heightened pleading standard where "the object of the conspiracy is fraudulent").

Second, Plaintiff has failed to allege that Defendant misrepresented the capabilities of the FLIR ONE Pro camera. Specifically, Plaintiff alleges that Defendant offered misleading statements about the accuracy of the camera because it "knew or should have known" that its camera was capable of greater accuracy. (*Id.* ¶¶ 34-35.) That Plaintiff was able to subsequently modify the camera does not change the undisputed factual statement that "standing alone," the FLIR ONE Pro has an accuracy of ± 3° Celsius. (*Id.* ¶ 29.) Plaintiff does not dispute the validity of this statement; Plaintiff instead suggests the statement is inaccurate because it is incomplete. But Plaintiff has not shown that Defendant was required to offer a disclaimer when providing truthful information (i.e., that a third party potentially could improve the camera's range of accuracy through software use). Nor has Plaintiff demonstrated that Defendant can be held liable for an alleged misuse of a truthful statement by another.

Finally, Plaintiff fails to adequately allege an actionable statement about the parties' contractual relationship. Plaintiff identifies a published statement from a "FLIR representative" that the parties "do not have a PSA with Feevr or XLab[s] or an agreement for them to use our copyrighted material" (FAC ¶ 33) and that the 2018 PSA was "cancelled" (FAC ¶ 38). Plaintiff alleges that these statements were false and misleading given their use in the IPVM articles to convey the inaccuracy of the FEEVR system. However, Plaintiff appears to seize on nuances surrounding these statements—e.g., the use of the present tense to describe the status of the contractual relationship or the use of the word "cancelled" rather than "replaced"—without providing the details required by Rule 9(b) to determine whether there is a claim to be stated against Defendant.

In short, Plaintiff has failed to allege any false statements attributable to Defendant under the Lanham Act and California's FAL.[3] Accordingly, Defendant's motion to dismiss Plaintiff's fifth and sixth claims is **GRANTED**.

### E.  **Plaintiff's UCL Claim Fails.**

To state a claim for unfair competition under California Business and Professions Code § 17200 ("UCL"), Plaintiff "must establish that the practice is either unlawful (i.e., is forbidden by law), unfair (i.e., harm to victim outweighs any benefit) or fraudulent (i.e., is likely to deceive members of the public)."

---

[3] Because Plaintiff's FAL claim is deficiently pleaded, the Court does not address Defendant's standing argument. (*See* Mot. at 20-21.)

*Sonoma Foods, Inc. v. Sonoma Cheese Factory, LLC*, 634 F. Supp. 2d 1009, 1022 (N.D. Cal. 2007) (quoting *Albillo v. Intermodial Container Servs., Inc.*, 114 Cal. App. 4th 190, 206 (2003)).

Plaintiff alleges that Defendant has violated the UCL "[b]y invoking unconscionable unilateral, illusory, and unenforceable termination for convenience provisions" and "by attempting to contractually prohibit intentional fraud and tort claims . . . [and] attempting to contractually limit recovery of damages. . . ." (FAC ¶ 83 (citing California statutes).) Defendant argues that the cited California statutes do not apply because the PSAs are governed by Delaware law. (Mot. at 24 (citing Kushernov Decl., Exs. 1, 3 § 11.1).) While Plaintiff does not contest the general applicability of Delaware law, it asserts that California's interest in protecting its businesses outweighs Delaware's nominal interest in the choice of law provision. (Opp. at 14.) *See Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 465 (1992) (adopting the Restatement Second of Conflict of Laws as applied to contractual choice-of-law provisions). Because Plaintiff's arguments fail under California law (and because the parties provide insufficient analysis of the issue), the Court will assume that California law applies here.

With limited analysis, Plaintiff alleges that the PSAs violate California Civil Code §§ 1580, 1670.5, and 1668. (Opp. at 14-15.) These statutes set forth general contract principles. *See* Cal. Civ. Code § 1580 (defining mutual consent); *id.* § 1670.5 (describing the remedies available for unconscionable contracts); *id.* § 1668 (declaring as contrary to public policy any contract that exempts one from liability for fraud, willful injury, or a violation of law). None condemns a provision conferring a unilateral right to terminate with notice. *See Mutz v. Wallace*, 214 Cal. App. 2d 100, 111 (1963) ("It is well established in this state that if a power of arbitrary termination is exercisable only upon notice, the requirement of notice is a sufficient legal detriment to constitute consideration and hence an enforceable obligation."). Plaintiff offers no authority to the contrary.

Nor does Plaintiff otherwise demonstrate that these general statutes provide the predicate for a UCL claim here. To the extent that Plaintiff claims that it entered into an illegal contract in violation of section 1668, the general rule is that such a contract is unenforceable and "'may not serve as the foundation of any action, either in law or in equity.'" *See Kelton v. Stravinski*, 138 Cal. App. 4th 941, 949 (2006) (internal citation omitted). "Rather, the parties will be left where they are found when they come to a court for relief." *Id.* Plaintiff does not explain how its voluntary participation in a purportedly illegal arrangement opens the door to a separate statutory remedy under the UCL. And to the extent that Plaintiff's

UCL claim is based on its alleged injuries for fraudulent inducement, false statements about FEEVR, and coordination with IPVM (Opp. at 14-15), those allegations are deficient as previously discussed. *See Aleksick v. 7-Eleven, Inc.*, 205 Cal. App. 4th 1176, 1185 (2012) (flawed foundation cannot support a UCL claim).

Defendant's motion to dismiss Plaintiff's fourth claim is therefore **GRANTED**.

### F. Leave to Amend

If a court dismisses certain claims, "[l]eave to amend should be granted unless the district court 'determines that the pleading could not possibly be cured by the allegation of other facts[.]'" *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009) (quoting *Lopez v. Smith*, 203 F.3d 1122, 112 (9th Cir. 2000) (en banc)); *see also* Fed. R. Civ. P. 15(a).  Under this standard, the Court finds that leave to amend is appropriate for each of Plaintiff's claims except for its implied covenant claim.  Because the Court cannot rewrite the contractual provision allowing Defendant to terminate "without cause" into one requiring cause to terminate, the Court **DENIES** Plaintiff leave to amend its first claim.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion is **GRANTED**.  Should Plaintiff wish to file a second amended complaint it must do so by January 22, 2021.

0/34